IN THE UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF TEXAS
DALLAS DIVISION

| | | |
|---|---|---|
| HUGO SOTELO DE ÁVILA, | § | |
| | § | |
| Petitioner, | § | |
| | § | |
| V. | § | No. 3:25-cv-3163-BN |
| | § | |
| MONSERRAT ARRIAGA GUTIÉRREZ, | § | |
| | § | |
| Respondent. | § | |

**MEMORANDUM OPINION AND ORDER**

Petitioner Hugo Sotelo De Ávila ("Petitioner" or "Sotelo"), through counsel, filed this action against Respondent Monserrat Arriaga Gutiérrez ("Respondent" or "Gutiérrez") under the United Nations Hague Convention on the Civil Aspects of International Child Abduction (the "Hague Convention" or "Convention"), Mar. 26, 1986, T.I.A.S. No. 11670, S. Treaty Doc. No. 99-11, implemented by the International Child Abduction Remedies Act ("ICARA"), 102 Stat. 437, as amended, 22 U.S.C. § 9001 *et seq.*, regarding their minor daughter, A.X., in which Sotelo asserts that Gutiérrez has wrongfully retained A.X. in the United States and seeks to secure A.X.'s return to Mexico. *See* Dkt. No. 1.

United States District Judge Ada Brown, granting Sotelo's emergency *ex parte* application, entered a temporary restraining order prohibiting Gutiérrez from removing A.X. from the jurisdiction of the Court pending a hearing on the merits of Sotelo's complaint, which Judge Brown then extended to February 26, 2026 [Dkt. Nos. 9 & 22] (the "TRO").

Gutiérrez, through counsel, answered the complaint, and, the same day, the

parties filed a joint status report under Federal Rule of Civil Procedure 26(f). *See* Dkt. Nos. 24 & 25.

Through their Rule 26(f) report, the parties consented to this action being referred to a United States magistrate judge to conduct all further proceedings, including entry of judgment, under 28 U.S.C. § 636(c). *See* Dkt. No. 25 at 2. And Judge Brown entered an order on January 20, 2026 transferring the case to the undersigned under Section 636(c). *See* Dkt. No. 27.

Also through the Rule 26(f) report, Gutiérrez "consent[ed] to the current TRO [Dkt. No. 9] being extended until such time as the Court issues a final decision on the merits." Dkt. No. 25 at 2.

Considering her consent, the Court found good cause to extend the TRO until judgment is entered in this case through an order entered on January 20 that also set this matter for a consolidated hearing on the motion for preliminary injunction and trial on the merits on February 23, 2026. *See* Dkt. No. 28; FED. R. CIV. P. 65(b)(2); FED. R. CIV. P. 65(a)(2).

The parties through counsel appeared at the final pretrial conference on February 19, 2026. *See* Dkt. No. 50. And the Court entered the Final Pretrial Order [Dkt. No. 51] later the same day.

Although the consolidated hearing on the motion for preliminary injunction and trial on the merits was continued for two days to accommodate an unforeseen illness, *see* Dkt. Nos. 55-61, proceedings began on February 25, 2026 and closed on February 26, 2026, *see* Dkt. Nos. 63 & 64.

Considering the record, *see* Dkt. Nos. 65-70, the parties' trial briefs, *see* Dkt. Nos. 39, 40, & 43-45, and their proposed findings of fact and conclusions of law, *see* Dkt. Nos. 73-76, the Court generally adopts Sotelo's proposed findings and conclusions [Dkt. Nos. 74 & 76] as supported by the evidence and the applicable legal standards, *see Sanchez v. Iduarte*, No. 4:21-cv-984-P, 2022 WL 463386 (N.D. Tex. Feb. 15, 2022), and, so, for the reasons set out therein and as explained below, the Court GRANTS Sotelo's petition and ORDERS that A.X. be returned to Mexico forthwith.

## Applicable Background

The Court draws this background from the parties' stipulated facts as set out in the Final Pretrial Order:

> A.X. was born on January 29, 2019, in San Luis Potosi, Mexico.
> A.X. turned 7 years old on January 29, 2026.
> A.X. is a Mexican citizen.
> A.X. does not currently have Lawful Permanent Residence status (also commonly referred to as a "Green Card") in the United States.
> Respondent is A.X.'s biological mother.
> Respondent is a Mexican citizen.
> Respondent is not a United States citizen.
> Respondent does not currently have Lawful Permanent Residence status (also commonly referred to as a "Green Card") in the United States.
> A.X. is not a United States citizen.
> Petitioner is A.X.'s biological father.
> Petitioner is a citizen of Mexico.
> Petitioner is employed at Valeo, a motor vehicle parts manufacturing company, as a Mechanical Design Engineer.
> Petitioner has worked at Valeo since March 2013.
> Petitioner and Respondent are identified as A.X.'s mother and father on her birth certificate. *See* A.X.'s Birth Certificate attached on the docket at Dkt. No. 46-6.
> After A.X. was born and until Respondent relocated her to the United States, she lived in Mexico.

From birth [until] she was two years old, A.X. lived with Petitioner and Respondent in Petitioner's home in San Luis Potosi, Mexico.

In early 2021, Petitioner and Respondent separated.

After Petitioner and Respondent separated, A.X. continued to live with Respondent in Petitioner's home located in San Luis Potosi, Mexico, and Petitioner moved in with his parents.

At all times since A.X.'s birth, Petitioner has paid for the home at San Luis Potosi, Mexico.

At all times since A.X.'s birth, Petitioner has contributed to A.X.'s education fund.

From the time the divorce decree was entered, through the present, Petitioner has made regular child support payments.

As part of the divorce, Petitioner and Respondent agreed to various custody terms.

The custody agreement granted physical custody to Respondent, *patria potestas* (parental rights) to both parties, and weekend visitation rights to Petitioner.

Petitioner has never signed any legal document, in either Mexico or the United States, terminating or otherwise giving up his legal rights.

In May 2022, Respondent requested to temporarily relocate to the United States with A.X. for a period of three years.

Respondent represented that such period was to coincide with her husband's temporary secondment to the United States.

Petitioner agreed to this temporary relocation based on (1) the representations by Respondent that it would only last three years and that A.X. would permanently return to Mexico in May 2025; (2) that he be allowed regular video calls with A.X., facilitated by Respondent; and (3) that Respondent would return home to Mexico with A.X. once every three months (the "Temporary Relocation Agreement").

On May 18, 2022, based on the Temporary Relocation Agreement between Petitioner and Respondent, Petitioner signed an authorization for A.X. to temporarily relocate to the U.S. with Respondent for a period of three years (May 2022 to May 2025).

In May 2022, Respondent and A.X. left Mexico for their temporary relocation to the United States.

Prior to May 2022, A.X. had lived only in Mexico.

Between May 2022 and the present, A.X returned to visit Mexico five times.

In February 2024, Petitioner visited A.X. in the United States and spent three days with her.

In or about March 2025, Respondent informed Petitioner for the first time that A.X. would not be returning to Mexico in May 2025 as previously agreed.

In March 2025, Respondent requested that Petitioner renew the Travel Authorization for A.X. from May 2022 to May 2025.

Petitioner refused to sign a renewal of the Travel Authorization for A.X. from May 2022 to May 2025.

Petitioner told Respondent that he would not agree to amend the terms of the Temporary Relocation Agreement and that he expected Respondent to return A.X. in May 2025, as planned.

In May 2025, Respondent did not return A.X. to Mexico.

In June 2025, Petitioner filed with the Mexican Authority for the Discharge of the Hague Convention on Civil Aspects of the International Child Abduction of 25 October 1980 the Application Form (the "Hague Application") regarding A.X.

Since May 2025, both Petitioner and Respondent have engaged in legal proceedings in Mexican Family Courts related to A.X.'s custody.

At no point, including since May 2025, has Petitioner signed any documentation or testified in any legal proceeding renouncing or terminating his custody rights of A.X.

At no point, including since May 2025, has Petitioner signed any documentation or testified in any legal proceeding that he gives his permission for A.X. to remain in the United States indefinitely.

Dkt. No. 51 at 13-17 (cleaned up).

## Legal Standards

"The Hague Convention's overall goal is to address the problem of international child abductions during domestic disputes." *Smith v. Smith*, 976 F.3d 558, 561 (5th Cir. 2020) (cleaned up).

And, so, it "was designed to restore the pre-abduction status quo," *Sealed Appellant v. Sealed Appellee*, 394 F.3d 338, 344 (5th Cir. 2004) (cleaned up), by "mandat[ing] the return of a child wrongfully removed from her country of habitual residence upon petition," *Guevara v. Castro*, 155 F.4th 353, 360 (5th Cir. 2025) (cleaned up).

In doing so, "[t]he Convention is based on the principle that the best interests of the child are well served when decisions regarding custody rights are made in the

country of habitual residence." *Galaviz v. Reyes*, 95 F.4th 246, 251 (5th Cir. 2024) (cleaned up).

The Convention is therefore "not concerned with establishing the person to whom custody of the child will belong at some point in the future." *Sealed*, 394 F.3d at 344 (cleaned up).

Instead, "[i]t seeks, more simply, to prevent a later decision on the matter being influenced by a change of circumstances brought about through unilateral action by one of the parties." *Id.* (cleaned up).

"A parent wrongfully removes a child when he or she removes or retains the child outside the child's country of habitual residence, and this removal: breaches the rights of custody accorded to the other parent under the laws of that country; and, at the time of removal, the non-removing parent was exercising those custody rights." *Id.* at 343 (cleaned up).

And, so, the "habitual residence" determination is made "at the time of removal or retention." *Monasky v. Taglieri*, 589 U.S. 68, 77 (2020) ("The place where a child is at home, at the time of removal or retention, ranks as the child's habitual residence." (citation omitted)).

But "'[h]abitual residence' is not the same as residence or domicile." *Harm v. Lake-Harm*, 16 F.4th 450, 451 n.1 (5th Cir. 2021). It is instead "a term of art defined by and uniquely applicable to Hague Convention cases." *Id.* And, as a panel of the United States Court of Appeals for the Fifth Circuit recently put it, "habitual residence" is

the place where a child is at home, and the determination is highly fact specific. To assess habitual residence, a court may consider the child's physical location, the passage of time, the child or parent's immigration status, family ties, and the location of personal belongings, among other factors. For young children, a caregiving parent's ties to the country at issue [are] highly relevant. [C]ourts must [remain] sensitive to the unique circumstances of the case and informed by common sense, and in doing so, recognize situations where an infant lived in a country only because a caregiving parent had been coerced into remaining there.

*Sarzosa v. Vergara*, No. 25-40052, 2025 WL 2694843, at *1 (5th Cir. Sept. 22, 2025)

(per curiam) (cleaned up; quoting *Monasky*, 589 U.S. at 77, 78 n.3, 80 n.4, 78).

"The Convention inquiry, then, consists of three elements, which the petitioner must establish by a preponderance of the evidence. *See* 42 U.S.C. § 11603(e)(1). First, the petitioner must show that the respondent removed or retained the child somewhere other than the child's habitual residence. If so, the question becomes whether the removal or retention violated the petitioner's rights of custody under the habitual-residence nation's laws. These rights need not be enshrined in a formal custody order issued before the removal or retention; the Convention also recognizes rights of custody that arise "*ex lege*." Assuming that the petitioner has rights of custody, she then need only make the final, and relatively easy showing that at the time of removal or retention those rights were actually exercised, either jointly or alone, or would have been so exercised but for the removal or retention. Generally, courts liberally find that rights of custody have been exercised unless evidence demonstrates acts that constitute clear and unequivocal abandonment of the child.

*Larbie v. Larbie*, 690 F.3d 295, 307 (5th Cir. 2012) (cleaned up), *abrogated on other grounds by Monasky*; *see Smith*, 976 F.3d at 561 n.1 ("In light of the [United States] Supreme Court's holding in *Monasky* that a child's habitual residence should be determined by looking to the totality of the circumstances, to the extent that our circuit's prior caselaw in *Larbie* and other cases has prioritized the parents' shared intent over other factors, we overrule that emphasis." (citations omitted)).

And, while "the Convention's default rule is that the child must be returned to

her country of habitual residence," it "does not pursue that goal at any cost" by "recogniz[ing] that, in certain cases, the interests of the child may be better served by the child remaining in her new environment, and," so, "it provides several narrow affirmative defenses to wrongful removal." *Guevara*, 155 F.4th at 360 (cleaned up).

> Under ICARA, the party petitioning for the child's return bears the burden of establishing by a preponderance of the evidence that the child was wrongfully removed or retained. [22 U.S.C.] § 9003(e)(1). If the court finds the child was wrongfully removed or retained, the respondent opposing return of the child has the burden of establishing that an exception to the return requirement applies. § 9003(e)(2). …. Absent a finding that an exception applies, a child determined to be wrongfully removed or retained must be "promptly returned" to the child's country of habitual residence. § 9001(a)(4).

*Golan v. Saada*, 596 U.S. 666, 671-72 (2022) (cleaned up).

The affirmative defenses or "exceptions" – "the term employed by the implementing legislation," *Hernandez v. Garcia Pena*, 820 F.3d 782, 786 n.4 (5th Cir. 2016) (citing 22 U.S.C. § 9003(e)(2)) – provided by the Convention are, to reiterate, "narrow," *Sealed*, 394 F.3d at 393 (citing Convention, arts. 12, 13, 20):

> A child may not be returned to his country of habitual residence if the removing party can show, by a preponderance of the evidence, that: the non-removing party was not exercising custody rights at the time of the child's removal; or, the child is of proper age and maturity and has decided he does not want to return. Convention, arts. 12, 13(a); 42 U.S.C. § 11603(e)(2)(B). A removing party also may prevent the child's return if she can show, by clear and convincing evidence, that: principles relating to the protection of human rights and fundamental freedoms do not permit the return of the child; or, the return would cause grave risk to the child's mental or physical well-being. Convention, arts. 20, 13(b); 42 U.S.C. § 11603(e)(2)(A).

*Id.* (cleaned up).

And, so, the Court's sole task under the Convention and ICARA is to order the return of a child wrongfully removed unless an exception applies. *See, e.g.*, *Guevara*,

155 F.4th at 367 ("This decision is not easy, nor is it without sorrow. But it accords with the Convention's core objective: 'to restore the pre-abduction status quo and to deter parents from crossing borders in search of a more sympathetic court.' Because [petitioner] established a prima facie case for return – and because [an] exception does not apply – the district court erred in denying his petition." (cleaned up; quoting *England v. England*, 234 F.3d 268, 271 (5th Cir. 2000))).

## Analysis

### I.    Sotelo has established a prima facie case for return.

Sotelo has established by a preponderance of the evidence that, since May 2025, Gutiérrez has wrongfully retained A.X. in the United States where Mexico (not the United States) is A.X.'s habitual residence, in violation of Sotelo's rights of custody under the Convention (and Mexican law), which he was exercising at the time of the wrongful retention, and, so, Sotelo has established a prima facie case for A.X.'s return to Mexico. *See Larbie*, 690 F.3d at 307.

### A.    In May 2025, A.X.'s habitual residence was Mexico.

Because of its importance, the Court repeats that "[t]he Convention uses the phrases 'wrongful removal or retention' and 'right of custody' as terms of art":

> A removal or retention is "wrongful" under the Convention when (1) it is in breach of rights of custody attributed to a person ... under the law of the State in which the child was habitually resident immediately before the removal or retention; and (2) at the time of removal or retention those rights were actually exercised, either jointly or alone, or would have been so exercised but for the removal or retention. The Convention considers rights of custody [to] include rights relating to the care of the person of the child and, in particular, the right to determine the child's place of residence. These rights differ from rights of access, which include the right to take a child for a limited period of time to a place other than the child's habitual residence.

- 9 -

*Larbie*, 690 F.3d at 307 (cleaned up).

And, so, Gutiérrez's retaining A.X. in the United States since May 2025 cannot be "wrongful" if the United States somehow became A.X.'s habitual residence prior to May 2025. Indeed, Gutiérrez urges the Court to accept that the United States is A.X.'s habitual residence because that is where she has resided with Gutiérrez and her husband since May 2022, when the family temporarily relocated here for his job. But this position is supported by neither the facts nor the law.

Consider first the applicable facts on which the parties agree:

> In May 2022, Respondent requested to temporarily relocate to the United States with A.X. for a period of three years.
> Respondent represented that such period was to coincide with her husband's temporary secondment to the United States.
> Petitioner agreed to this temporary relocation based on (1) the representations by Respondent that it would only last three years and that A.X. would permanently return to Mexico in May 2025; (2) that he be allowed regular video calls with A.X., facilitated by Respondent; and (3) that Respondent would return home to Mexico with A.X. once every three months (the "Temporary Relocation Agreement").
> On May 18, 2022, based on the Temporary Relocation Agreement between Petitioner and Respondent, Petitioner signed an authorization for A.X. to temporarily relocate to the U.S. with Respondent for a period of three years (May 2022 to May 2025).
> In May 2022, Respondent and A.X. left Mexico for their temporary relocation to the United States.
> Prior to May 2022, A.X. had lived only in Mexico.
> Between May 2022 and the present, A.X returned to visit Mexico five times.
> In February 2024, Petitioner visited A.X. in the United States and spent three days with her.
> In or about March 2025, Respondent informed Petitioner for the first time that A.X. would not be returning to Mexico in May 2025 as previously agreed.
> In March 2025, Respondent requested that Petitioner renew the Travel Authorization for A.X. from May 2022 to May 2025.
> Petitioner refused to sign a renewal of the Travel Authorization for A.X. from May 2022 to May 2025.

> Petitioner told Respondent that he would not agree to amend the terms of the Temporary Relocation Agreement and that he expected Respondent to return A.X. in May 2025, as planned.
> In May 2025, Respondent did not return A.X. to Mexico.

Dkt. No. 51 (Stipulations of Fact Nos. 25-37).

As these agreed-upon facts reflect, when Sotelo allowed A.X. to relocate with Gutiérrez to the United States, this arrangement – which Sotelo never agreed to extend – was expressly limited to three years. Sotelo therefore never agreed to allow A.X. to reside in the United States permanently.

In this respect, "[t]he Supreme Court held in *Monasky* that," although "a child's habitual residence depends on the totality of the circumstances specific to the case," "a child's residence in a particular country can be deemed 'habitual' ... only when her residence there is more than transitory." *Smith*, 976 F.3d at 562 (cleaned up).

And, "when a child moves to a new country but whose presence there is deemed 'transitory,'" "the country in which the child habitually resided prior to such move remains the child's habitual residence." *Harm*, 16 F.4th at 451-52 (cleaned up).

Consequently, "[t]hat country is the jurisdiction of any Hague Convention custody dispute between such child's parents." *Id.* at 452.

And that is consistent with what happened here: As soon as Sotelo did not agree to extend A.X.'s time in the United States, Gutiérrez turned to the courts of Mexico, not the courts of Texas. *See, e.g.*, Dkt. No. 51, Stipulation of Facts No. 39 ("Since May 2025, both Petitioner and Respondent have engaged in legal proceedings in Mexican Family Courts related to A.X.'s custody.").

And that Mexico was still A.X.'s habitual residence in May 2025, when Sotelo's

permission for her to remain in the United States expired, is further supported by the totality of the unique circumstances here, considering the factors as laid out by the Supreme Court and the Fifth Circuit.

While A.X. was physically located in the United States at that time, her (and her mother's and stepfather's) immigration status in the United States reflected the transitory nature of the family's presence here. *See, e.g.*, Dkt. No. 74 (Sotelo's proposed findings and conclusions) at 11 ("Respondent came to the United States in connection with her husband's work visa which allowed Respondent and A.X. to remain in the United States for a period of three years, from May 2022 to May 2025. Tr. Vol. 2 [Dkt. No. 68], at 105:9-17. She admitted that if they lost their visas, they would have had no legal authority to remain in the United States. Tr. Vol. 2, at 106:7-12. If that had happened, Respondent freely stated that she and A.X. would have returned to Mexico. *Id.* She did not say that she would have tried to stay in the United States or move somewhere else. *Id.* Respondent and A.X. did not file for permanent residency in the United States until after the time for Respondent to return A.X. to Mexico had already passed and Respondent had decided that she would rather stay in the United States than return home. Tr. Vol. 2, at 110:18–20." (cleaned up)).

And A.X. has established family ties to Mexico that have been maintained during the time that she temporarily relocated to the United States with her mother and stepfather. *See id.* at 16 ("As part of [his agreeing to allow A.X. to relocate to the United States with her mother], Mr. Sotelo insisted on certain conditions meant to protect Mr. Sotelo's custody rights and preserve his relationship with A.X. Tr. Vol. 2,

at 22:4-10. Those conditions included regular communication via phone or video calls and regular trips home Mexico every three months. Tr. Vol. 2, at 22:4-10; 52:2-11. At first, A.X. made regular trips home to Mexico – about five in total. Tr. Vol. 2, at 23:24-25. During two of those regular trips home, Mr. Sotelo took A.X. on family trips with her aunts, uncles, cousins, and grandparents to ensure that she maintained strong ties to her paternal family. Tr. Vol. 2, at 22:13-17. During the other three trips home to Mexico, A.X. stayed at her paternal grandparents' home with Mr. Sotelo as the sole caretaker. Tr. Vol. 2, at 24:4-6; 120:12-19. Eventually, Respondent failed to bring A.X. home to Mexico to visit Mr. Sotelo due to scheduling issues. Tr. Vol. 2, at 98:3-5. To co-parent effectively and accommodate A.X.'s schedule, Mr. Sotelo traveled to the United States to visit A.X. Tr. Vol. 2, at 53:14-18.").

And that Gutiérrez and her family have applied for Lawful Permanent Residence ("LPR") status does not alter the habitual-residence analysis where the unilateral filing of an LPR application well after May 2025 (especially one that has yet to be approved) does not retroactively justify a retention that is otherwise wrongful under the Convention and ICARA or impede the Court's making required rulings as to wrongful retention. *See Monasky*, 589 U.S. at 77; *cf. Sanchez v. R.G.L.*, 761 F.3d 495, 510 (5th Cir. 2014) ("No authority has been offered to support the argument that the discretionary grant of asylum confers a right to remain in the country despite judicial orders under this Convention. The asylum grant does not supersede the enforceability of a district court's order that the children should be returned to their mother, as that order does not affect the responsibilities of either

- 13 -

the Attorney General or Secretary of Homeland Security under the [Immigration and Nationality Act].” (cleaned up)).

Nor does it matter for purposes of the Convention and ICARA that a Mexican court may have found “that A.X.’s current habitual residence was the United States of America on February 12, 2026.” Dkt. No. 73 (Respondent’s proposed findings of fact and conclusions of law) at 2.

As to this, Gutiérrez more generally argues that, as a matter of international comity, the Court must defer to determinations made in the “ongoing custody proceedings involving A.X. in Mexico.” *Id.* at 3.

Such arguments are wrong for multiple reasons.

First, no evidence reflects that a Mexican court is considering – or has considered – the same discrete issues confronted by the Court in this proceeding under the Convention and ICARA. And, so, the Court owes no deference to the Mexican legal proceedings.

As another federal district court recently put it, “under ICARA, ‘courts must give full faith and credit to the Hague Convention determinations of other American courts, state or federal, but only when those determinations are rendered pursuant to the Convention, in an action brought under ICARA and the Convention.’” *Goderth v. Yandall-Goderth*, No. 24-cv-8211, 2025 WL 1866307, at *9 n.5 (N.D. Ill. July 7, 2025) (cleaned up; quoting *Redmond v. Redmond*, 724 F.3d 729, 741 n.7 (7th Cir. 2013) (quoting 42 U.S.C. § 11603(g))).

“This special preclusion rule does not, on its face, affirmatively authorize

American courts to apply res judicata principles to the Hague Convention determinations of foreign courts; it's an open question whether it precludes application of res judicata principles to foreign Hague Convention determinations." *Redmond*, 724 F.3d at 741 n.7 (cleaned up).

And, while "the decision to extend comity to a foreign nation's judgment is within a court's discretion, the answer is not always that straightforward in Hague Convention cases" – "and most Hague Convention cases that have raised questions of comity involve situations where a foreign court had already adjudicated a related Hague petition." *Goderth*, 2025 WL 1866307, at *9 n.5 (cleaned up; quoting *Pedersen v. Shriver*, No. 23-cv-13836, 2024 WL 3718189, at *6 (N.D. Ill. Aug. 8, 2024)); *accord Van Driessche v. Ohio-Esezeoboh*, 466 F. Supp. 2d 828, 843 (S.D. Tex. 2006) ("In the instant action, Van Driessche does not allege there is another Hague petition adjudication in the United States or in Belgium. Accordingly, there is no other Hague Petition adjudication to which this Court considers deferring as a matter of comity. The full faith and credit provision of ICARA does not require this Court, as a matter of comity and res judicata, to accord full faith and credit to the underlying Belgian court interim orders or its custody determination."); *see also Guimaraes v. Brann*, 562 S.W.3d 521, 538, 530, 543 (Tex. App. – Houston [1st Dist.] 2018, pet denied).

More broadly, and as already explained, the purpose of this proceeding is not to make custody or visitation determinations as to X.A. but to restore the pre-wrongful-retention status quo under a framework – established by an international convention entered into by the United States and Mexico and implemented by a

federal statute – that defines a remedy for a historical wrong that, if proven and if no exception applies, mandates return. *Cf. Sealed*, 394 F.3d at 343 ("For purposes of the Convention, it is irrelevant whether there is a custody dispute concerning that child pending at the time of removal.").

After that – and once there is "no international legal void that requires the Convention's intervention" – "[t]he courts in Mexico … are able to grant appropriate relief to address [custody or visitation] concerns." *Madrigal v. Tellez*, 848 F.3d 669, 675 (5th Cir. 2017) (footnote omitted).

And to the extent that Gutiérrez has argued that there is no role for the Convention under the circumstances here because custody proceedings are ongoing in Mexico, the country where both sides agree such determinations should be made, she misapprehends the role of the Convention and ICARA.

That is at least because Gutiérrez's failure to maintain the status quo by not returning with A.X. to Mexico in May 2025, after the travel authorization to which Sotelo consented expired, necessitates the remedy of return under the Convention and ICARA, particularly where the record reflects that custody and visitation decisions by the Mexican courts since then have been influenced by Gutiérrez's retaining A.X. in the United States, a consequence that the Convention is designed to prevent. *See, e.g.*, Dkt. No. 69 at 10:6-13:7 (testimony from an attorney representing Gutiérrez in the Mexican proceedings explaining that Sotelo's rights were modified by the courts there to allow visitation with X.A. only over Zoom "so that she would not be forced to return to Mexico to spend time with her father");

*Sealed*, 394 F.3d at 344 (While the Convention is "not concerned with establishing the person to whom custody of the child will belong at some point in the future," it does seek "to prevent a later decision on the matter being influenced by a change of circumstances brought about through unilateral action by one of the parties." (cleaned up)).

> **B.** **A.X.'s being retained in the United States violated Sotelo's rights of custody, rights that Sotelo was exercising at the time that A.X. was retained.**

The parties agree that their "custody agreement granted physical custody to [Gutiérrez], *patria potestas* (parental rights) to both parties, and weekend visitation rights to [Sotelo]" and that Sotelo "has never signed any legal document, in either Mexico or the United States, terminating or otherwise giving up his legal rights." Dkt. No. 51 at 15.

> Today, *patria potestas* rights regulate relations between parents and children until the latter reach the age at which they must fend for themselves. It represents the most comprehensive right that a parent can exercise over the person and property of his or her minor children, including custody of the minors, the authority to raise them, discipline them, represent them in legal acts, administer their property, feed and care for them, etc.

*Garcia v. Posada*, 728 F. Supp. 3d 430, 438 (N.D. Tex. 2024) (cleaned up).

"As it comes to federal courts interpreting the cross over between *patria potestas* rights and 'rights of custody,' a significant number of courts have held that *patria potestas* rights are 'rights of custody' under the Convention." *Id.* (collecting cases).

And, even though Gutiérrez was granted sole physical custody of A.X., Sotelo's unextinguished *patria potestas* rights still "confer[] Hague Convention standing." *Id.*

- 17 -

at 442-43 ("The first sentence in this divorce decree expressly grants *patria potestas* rights to both Garcia and Posada. And while the second sentence in the divorce decree grants sole physical custody to Posada, this Court follows *Lalo* in holding that a grant of *patria potestas* rights 'specifically incorporated in a custody agreement must amount to a divisible custody right.' That confers Hague Convention standing." (cleaned up; quoting *Lalo v. Malca*, 318 F. Supp. 2d 1152, 1156 (S.D. Fla. 2004))); *see also id.* at 443 (rejecting the argument "that a grant of custody to one parent extinguishes the left-behind parent's *patria potestas* rights" (citing *Garcia v. Pinelo*, 808 F.3d 1158, 1164-67 (7th Cir. 2015))).

And Sotelo was exercising his rights of custody at the time that A.X. was retained in the United States, as the record reflects that he has done the opposite of abandon his daughter. *See Sealed*, 394 F.3d at 345 ("[I]n the absence of a ruling from a court in the child's country of habitual residence, when a parent has custody rights under the laws of that country, even occasional contact with the child constitutes 'exercise' of those rights. To show failure to exercise custody rights, the removing parent must show the other parent has abandoned the child."); *see also id.* ("[I]f a person has valid custody rights to a child under the law of the country of the child's habitual residence, that person cannot fail to exercise those custody rights under the Hague Convention short of acts that constitute clear and unequivocal abandonment of the child. Once it determines that the parent exercised custody rights in any manner, the court should stop – completely avoiding the question whether the parent exercised the custody rights well or badly. These matters go to the merits of the

custody dispute and are, therefore, beyond the subject matter jurisdiction of federal courts." (cleaned up; quoting *Friedrich v. Friedrich*, 78 F.3d 1060, 1066 (6th Cir. 1996))).

For example, Gutiérrez "agreed that prior to (and after) the wrongful retention, Mr. Sotelo maintained contact with A.X. through videocalls and in-person visits." Dkt. No. 74 at 21 (citing Stip. Fact Nos. 31, 32; Tr. Vol. 2, at 25:25-26:1; 27:14-20; 121:19-20); *see also* Dkt. No. 51 at 15 (Stip. Fact Nos. 19-21) ("At all times since A.X.'s birth, Petitioner has paid for the home at San Luis Potosi, Mexico. At all times since A.X.'s birth, Petitioner has contributed to A.X.'s education fund. From the time the divorce decree was entered, through the present, Petitioner has made regular child support payments.").

And Gutiérrez's mere initiation in April 2025 of proceedings in Mexico to alter the parties' custody rights (prior to the expiration of the travel authorization) didn't alter the status quo of the established custody rights as of May 2025 as there was no final decision affecting those rights prior to the wrongful retention that occurred when Gutiérrez kept A.X. in the United States after expiration of the travel authorization. *Cf. Sealed*, 394 F.3d at 346 ("[T]he Convention does not require a pending custody suit for removal to be wrongful.").

## II.   Gutiérrez has not established that an exception to the return requirement applies.

In addition to her arguments concerning the controlling weight that she believes the Court must provide the Mexican legal proceedings – which the Court rejects for the reasons set out above – Gutiérrez raises three exceptions to the

Convention's return requirement, on which she bears the burden. But she has established none of them.

Gutiérrez first asserts that Sotelo consented or acquiesced to A.X.'s remaining in the United States by permitting her to travel here in May 2022 and by consenting to a six-year extension of A.X.'s Mexican passport. *See* Dkt. No. 73 at 2.

> The consent defense involves the petitioner's conduct prior to the contested removal or retention. The focus of inquiry is the petitioner's subjective intent, as evinced by the petitioner's statements or conduct, which can be rather informal. If a person has valid custody rights to a child under the law of the country of the child's habitual residence, that person cannot fail to exercise those custody rights under the Hague Convention short of acts that constitute clear and unequivocal abandonment of the child. Accordingly, a court liberally finds exercise whenever a parent with *de jure* custody rights keeps, or seeks to keep, any sort of regular contact with his or her child. The consent defense must be proven by a preponderance of the evidence. 22 U.S.C. § 9003(e)(2)(B).

*Hernandez v. Erazo*, No. 23-50281, 2023 WL 3175471, at *3 (5th Cir. May 1, 2023) (per curiam) (cleaned up).

Gutiérrez has not proven this exception by a preponderance of the evidence where (1) it's not disputed that Sotelo expressly did not consent to A.X. remaining beyond May 2025 and (2) agreeing to a renewed passport (but not an extended travel authorization) cannot amount to acquiescing to Gutiérrez's wrongfully keeping A.X. in the United States.

And, in any event, there is no record that Sotelo failed to keep in regular contact with A.X. or otherwise exercised his custody rights in any manner that could "constitute clear and unequivocal abandonment of" A.X.

Gutiérrez also asserts that requiring that A.X. return to Mexico would expose

- 20 -

A.X. to a grave risk of harm. *See* Dkt. No. 73 at 2.

"Article 13(b) of the Hague Convention provides that a court is not bound to return a child if one opposing the return establishes that there is a grave risk that his or her return would expose the child to physical or psychological harm or otherwise place the child in an intolerable situation." *Galaviz*, 95 F.4th at 254 (cleaned up).

A movant "must show that the risk to the child is grave, not merely serious"; that "[t]he grave risk involves not only the magnitude of the potential harm but also the probability that the harm will materialize"; and that "[t]he alleged harm [is] a great deal more than minimal and greater than would normally be expected on taking a child away from one parent and passing him to another." *Id.* at 256-57 (cleaned up); *see also, e.g.*, *Madrigal*, 848 F.3d at 677 ("Vergara is correct that the possible separation of a child from a parent is not sufficient to trigger the grave risk of harm exception." (citations omitted)); *England*, 234 F.3d at 271-72 ("The District Court's finding that return to Australia would expose Karina to a grave risk of psychological harm, then, was clearly erroneous.").

And ICARA requires that "[a] respondent arguing that return would expose the child to a grave risk of harm must establish that this exception applies by 'clear and convincing evidence.' § 9003(e)(2)(A)." *Golan*, 596 U.S. at 672.

> Clear and convincing evidence is a weight of proof which produces in the mind of the trier of fact a firm belief or conviction as to the truth of the allegations sought to be established. It is evidence so clear, direct and weighty and convincing as to enable the fact finder to come to a clear conviction, without hesitancy, of the truth of the precise facts. Mere speculation does not meet the clear and convincing burden.

*Galaviz*, 95 F.4th at 256 (cleaned up).

"Article 13(b) focuses on the risk of harm posed by the child's repatriation. It is not an invitation to determine whether custody with one parent would be in the best interest of the child. The question is whether there is clear and convincing evidence that return would expose the child to a grave risk of harm, not whether a parent is a worthy custodian." *Id.* at 257 (footnotes omitted).

And, so, "findings of grave risk are rare." *Soto v. Contreras*, 880 F.3d 706, 710 (5th Cir. 2018) (cleaned up).

And Gutiérrez has not proven this exception by clear and convincing evidence here where all she does is speculate – without citation to any record evidence – that Sotelo's medical condition affects "his ability to properly care for A.X." and "to work and take care of himself"; "causes violent outbursts"; and "could lead to physical or psychological harm to" A.X. Dkt. No. 73 at 2; *see also, e.g.*, Dkt. No. 76 at 11-12 ("Because Respondent presented no competent evidence tying Mr. Sotelo's medical condition to any physical or psychological harm, she has failed to meet her burden to establish this defense by clear and convincing evidence. The record evidence established that Mr. Sotelo has a medical condition, he has received treatment, and is not suffering any lasting symptoms. Tr. Vol. 2, 56:18-22; 57:5-12. Respondent identifies no factual evidence in the record supporting any other conclusion. Mr. Sotelo's medical condition is simply not a factor in his ability to care for A.X. And even if the Court accepted Respondent's unsupported factual findings, that falls well short of what is required to establish a grave risk." (citations omitted)).

Related to Gutiérrez's unfounded assertions in support of this exception, it's worth noting that she testified that, should the Court order that A.X. be returned to Mexico, she would accompany her daughter and continue in her role as the parent with sole physical custody of A.X. *Cf. Sealed*, 394 F.3d at 346 ("As Father stipulated at oral argument here, he does not request the children be returned in his care or physical custody; nor does he object to the children being returned to Australia in Mother's care and custody. Thus, Mother is to have primary physical custody of the children at all times during the return to, and while in, Australia, pending any custody determination by Australian courts.").

Gutiérrez finally raises the age and maturity (or mature child) defense.

"The Convention establishes that a court 'may refuse to order the return of the child if it finds that the child objects to being returned and has attained an age and degree of maturity at which it is appropriate to take account of its views.'" *Rodriguez v. Yanez*, 817 F.3d 466, 473 (5th Cir. 2016) (quoting *England*, 234 F.3d at 272 (quoting Convention art. 13(b))).

Under this exception, the respondent's burden is to establish "by a preponderance of the evidence," *De La Rosa v. Alonso*, No. 4:24-CV-00059-AGD, 2024 WL 4646975, at *6 (E.D. Tex. Oct. 30, 2024) (citing 22 U.S.C. § 9003), "two distinct facts: (a) [the child] has attained an age and degree of maturity at which it is appropriate to take account of her views; and (b) [the child] objects to being returned," *Rodriguez*, 817 F.3d at 474 (cleaned up).

Beginning with age, "[t]he Convention does not set an age at which a child is

automatically considered to be sufficiently mature, rather the determination is to be made on a case-by-case basis." *Smith v. Smith*, No. 4:19-cv-784-O, 2019 WL 13201172, at *3 (N.D. Tex. Nov. 20, 2019) (quoting *Vasconcelos v. Batista*, 512 F. App'x 403, 405 (5th Cir. 2013) (per curiam) (quoting *Tsai-Yi Yang v. Fu-Chiang Tsui*, 499 F.3d 259, 279 (3d Cir. 2007))), *aff'd*, 976 F.3d 558 (5th Cir. 2020).

And, while the Fifth Circuit "has 'declined to hold, as a matter of law, that any particular age is sufficient or insufficient to meet the defense,'" *Rodriguez*, 817 F.3d at 474 (quoting *Dietz v. Dietz*, 349 F. App'x 930, 934 (5th Cir. 2009)), it has also noted that the age of 13 "is consonant with that of other children whom courts have found to be of sufficient age and maturity for the purposes of this exception," *Vasconcelos*, 512 F. App'x at 405 (collecting cases).

As to the second fact that must be established by a preponderance of the evidence, "[t]he Convention requires an objection, 'not a mere preference.'" *Smith*, 2019 WL 13201172, at *3 (quoting *Rodriguez*, 817 F.3d at 476).

> The text of the Convention restricts the age and maturity exception to cases in which the child "objects" to being returned. A preference is not an objection. This is not a matter of magic words or talismanic language. There is a substantive difference between preferring to live in one of two countries – when living in either country would be acceptable – and affirmatively objecting to returning to one country – when living in that country would be unacceptable. Only an objection is sufficient to trump the Convention's strong presumption in favor of return.

*Rodriguez*, 817 F.3d at 476-77; *see also id.* at 476 ("[A]n objection by the child to being returned, if found to be a considered and mature decision, will be honored whether or not it rests in part on her objection to living with the abducting parent.").

And, so, "[c]ourts have distinguished between the 'wishes' of a child and a

- 24 -

child's objection, holding that wishes are associated with custody proceedings, and are thus not appropriate to consider in a Hague case" – that is, "'a child's objections as defined by the Hague Convention'" must be "'stronger and more restrictive'" than "'the child's wishes as in a typical child custody case.'" *Neumann v. Neumann*, 310 F. Supp. 3d 823, 835 (E.D. Mich. 2018) (quoting *Hirst v. Tiberghien*, 947 F. Supp. 2d 578, 597 (D.S.C. 2013)).

"In a similar vein, courts have required that children subject to the Convention set forth particularized reasons why they object to return, as opposed to a generalized opposition." *Id.* (citing *Tsai-Yi Yang*, 499 F.3d at 479.

Courts should also consider whether a child's objection to being returned is rooted in the wrongful detention itself. *See Tsai-Yi Yang*, 499 F.3d at 280.

And, "[e]ven if the Court [finds that] the child displayed sufficient age and maturity" – and expressed particularized objections, as opposed to generalized wishes – the Court may still reject "any objection by the minor child to returning" if that objection "is the result of undue influence." *Preston v. Preston*, No. 4:22-CV-00990-CAN, 2023 WL 300130, at *4 (E.D. Tex. Jan. 17, 2023) (citing *Vazquez v. Vasquez*, No. 3:13-cv-1445-B, 2013 WL 7045041, at *29 (N.D. Tex. Aug. 27, 2013)).

And "[t]he Fifth Circuit has explained that an in-camera interview with the child provides a proper basis for the court's consideration of the age and maturity defense." *De La Rosa*, 2024 WL 4646975, at *6 (citing *Vasconcelos*, 512 F. App'x at 406 & n.6 (citing TEX. FAM. CODE § 153.009)).

Here, the Court, following the Fifth Circuit's approved approach, appointed

an ad litem to meet with A.X. prior to and then accompany A.X. to an in-camera interview with the Court. *See* Dkt. Nos. 61, 62, & 70. During that interview, A.X. registered no objection at all to returning to and living in Mexico. *See generally* Dkt. No. 70. So, even if A.X. is of sufficient age and maturity, Gutiérrez has not proven this exception by a preponderance of the evidence.

But, before moving on, the Court must pause to document that Gutiérrez includes in her proposed findings of fact the statement "A.X. wishes to remain in the United States and A.X. objects to returning to Mexico." Dkt. No. 73 at 2. Gutiérrez points to no evidence in support. And that's not surprising since this proposed finding is belied by the transcript of the Court's in-camera interview. *See generally* Dkt. No. 70; *see also* FED. R. CIV. P. 11(b) ("By presenting to the court a pleading, written motion, or other paper – whether by signing, filing, submitting, or later advocating it – an attorney … certifies that to the best of the person's knowledge, information, and belief, formed after an inquiry reasonable under the circumstances ... the factual contentions have evidentiary support.").

### III. The Court declines to exclude objected-to evidence offered by Gutiérrez (or otherwise impose related sanctions) because this evidence is either irrelevant or insufficient as a matter of law.

Prior to trial and during the proceedings, Sotelo raised numerous evidentiary objections and moved for discovery sanctions under Federal Rule of Civil Procedure 37(c). *See, e.g.*, Dkt. No. 51 at 12-13; Dkt. No. 54.

And the Final Pretrial Order sets out, "[a]s the Court explained at the final pretrial conference, it is inclined to permit the parties' proffered testimony and exhibits subject to ruling on these objections and requests for exclusion under Rule

37(c) post-trial when issuing its findings of fact and conclusions of law." Dkt. No. 51 at 13.

The Court now finds that these discovery sanctions requests and evidentiary objections are mooted by its considering Gutiérrez's objected-to evidence and its finding – for all the reasons set out above – that this evidence is either irrelevant or insufficient as a matter of law.

## IV. The Court is inclined not to stay this return order pending any appeal.

While Gutiérrez has neither indicated that she would appeal a decision adverse to her nor requested that the Court stay any order requiring return, the Supreme Court "has warned that issuance of routine stays in Hague Convention cases 'would conflict with the Convention's mandate of prompt return to a child's country of habitual residence." *Garcia v. Ramsis*, No. 4:21-CV-650-SDJ, 2022 WL 1271129, at *1 (E.D. Tex. Apr. 28, 2022) (quoting *Chafin v. Chafin*, 568 U.S. 165, 178 (2013)).

Still, to "ensure[] that each case will receive the individualized treatment necessary for appropriate consideration of the child's best interests," "courts should apply the four traditional stay factors in considering whether to stay a return order: (1) whether the stay applicant has made a strong showing that he is likely to succeed on the merits; (2) whether the applicant will be irreparably injured absent a stay; (3) whether issuance of the stay will substantially injure the other parties interested in the proceeding; and (4) where the public interest lies." *Chafin*, 568 U.S. at 179.

And, while the Court cannot know the exact grounds that Gutiérrez may raise if she does move to stay this order, the Court observes that the Supreme Court "has

explained that '[i]f losing parents were effectively guaranteed a stay, it seems likely that more would appeal, a scenario that would undermine the goal of prompt return and the best interests of children who should in fact be returned.'" *Hernandez*, 2023 WL 3175471, at *4 (quoting *Chafin*, 568 U.S. at 179).

And, in *Hernandez*, the Fifth Circuit rejected as a basis to stay grounds that the Court could see Gutiérrez raising here:

> Erazo argues that both she and M.S.O. will suffer irreparable harm if he is returned to Mexico. She emphasizes the "physical and emotional disruption to M.S.O.'s life" and the further risk to his stability if she is successful in her appeal and M.S.O. must then return to the United States. Relatedly, she asserts that there is a strong public interest "in protecting children from the risk of being unnecessarily shuttled back and forth between two countries as a result of ongoing litigation." But these are the risks facing many of the children and parents litigating under the Hague Convention; granting stay applications such as these would become routine if Erazo's arguments, without more, were sufficient. Furthermore, we cannot ignore the "precious months" that M.S.O. might lose "readjusting to life in [his] country of habitual residence" given the dubious merits of Erazo's appeal, along with the harm that Ortiz suffers the longer that he is separated from M.S.O.

*Id.* (citations omitted).

## Conclusion

For the reasons set out above, the Court ORDERS A.X. to be returned to Mexico.

To help ensure that happens in an efficient manner, the Court ORDERS counsel for both sides to meet and confer in person, by telephone, or over an online platform such as Zoom no later than **10:00 a.m. on March 25, 2026** to facilitate A.X.'s return and then file a joint status report no later than **4:00 p.m. on March 25, 2026** setting out their proposal.

- 29 -

Counsel for Sotelo must initiate the conference and file the joint status report.

After the Court receives and reviews this report, it will enter a further order and a final judgment.

Until that occurs, the Court ORDERS Gutiérrez to not remove A.X. from the Northern District of Texas.

And, if Sotelo maintains his request for fees and costs related to this litigation, he must submit a motion and attach itemized evidence of all fees and costs requested by **April 23, 2026**.

SO ORDERED.

DATE: March 24, 2026

_____
DAVID L. HORAN
UNITED STATES MAGISTRATE JUDGE